UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

HUNTER DOUGLAS INC., et al.,

    Plaintiffs,

    v.

CHING FENG HOME FASHIONS CO., LTD.,

    Defendant.

Case No. 17-cv-01069-RS

**ORDER CONSTRUING CLAIMS**

## I. INTRODUCTION

Hunter Douglas and Ching Feng Home Fashions compete to develop, manufacture, promote, and sell window coverings such as blinds and shades. Hunter Douglas holds three patents at issue in this action: U.S. Patent No. 9,359,814 (the "'814 patent"), U.S. Patent No. 9,316,051 (the "'051 patent"), and U.S. Patent No. 9,328,554 (the "'554 patent"). Hunter Douglas accuses Ching Feng of infringing those patents. The parties seek construction of eight terms[1] pursuant to *Markman v. Westview Instruments, Inc.*, 52 F.3d 967 (Fed. Cir. 1995) (en banc). For the reasons set forth below, the disputed terms are construed as follows.

## II. BACKGROUND

Hunter Douglas is an industry leader in the field of window coverings such as blinds and

---

[1] During the course of briefing, the parties agreed that one of the originally disputed terms requires no construction. Accordingly, that term is not discussed here.

shades. The Asserted Patents describe innovations that permit the control of window coverings without the use of an external hand-operated control cord, making the products safer and easier to use. According to Hunter Douglas, the claims of the Asserted Patents are clear, unambiguous, and understood by one of ordinary skill in the art. Hunter Douglas does not believe any special construction needs to be given to the claim terms. Ching Feng disagrees, arguing that several terms require construction in order to avoid confusing a jury.

The present litigation concerns the following claims: claims 1-2, 4-20, 23, and 24 of the '814 patent; claims 1, 4-8, 17-21, and 24 of the '554 patent; and claims 1-3 of the '051 patent. The Asserted Patents share a common patent lineage as their respective specifications are substantively identical.

### III. LEGAL STANDARD

Claim construction is a question of law to be determined by the court. *Markman*, 52 F.3d at 979. "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim." *Renishaw PLC v. Marposs Societa' per Azioni*, 158 F.3d 1243, 1250 (Fed. Cir. 1998). Accordingly, a claim should be construed in a manner that "most naturally aligns with the patent's description of the invention."

The first step in claim construction is to look to the language of the claims themselves. "It is a 'bedrock principle' of patent law that 'the claims of a patent define the invention to which the patentee is entitled the right to exclude.'" *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (quoting *Innova/Pure Water, Inc. v. Safari Water Filtration Sys., Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004)). A disputed claim term should be construed in a manner consistent with its "ordinary and customary meaning," which is "the meaning that the term would have to a person of ordinary skill in the art in question at the time of the invention, i.e., as of the effective filing date of the patent application." *Phillips*, 415 F.3d at 1312–13. The ordinary and customary meaning of a claim term may be determined solely by viewing the term within the context of the claim's overall language. *See id.* at 1314 ("[T]he use of a term within the claim provides a firm basis for

construing the term."). Additionally, the use of the term in other claims may provide guidance regarding its proper construction. *Id.* ("Other claims of the patent in question, both asserted and unasserted, can also be valuable sources of enlightenment as to the meaning of a claim term.").

A claim should also be construed in a manner that is consistent with the patent's specification. *See Markman*, 52 F.3d at 979 ("Claims must be read in view of the specification, of which they are a part."). Typically the specification is the best guide for construing the claims. *See Phillips*, 415 F.3d at 1315 ("The specification is . . . the primary basis for construing the claims."); *see also Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("[T]he specification is always highly relevant to the claim construction analysis. Usually, it is dispositive; it is the single best guide to the meaning of a disputed term."). In limited circumstances, the specification may be used to narrow the meaning of a claim term that otherwise would appear to be susceptible to a broader reading. *See SciMed Life Sys., Inc. v. Advanced Cardiovascular Sys., Inc.*, 242 F.3d 1337, 1341 (Fed. Cir. 2001) ("Where the specification makes clear that the invention does not include a particular feature, that feature is deemed to be outside the reach of the claims of the patent, even though the language of the claims, read without reference to the specification, might be considered broad enough to encompass the feature in question."); *Phillips*, 415 F.3d at 1316 ("[T]he specification may reveal an intentional disclaimer, or disavowal, of claim scope by the inventor. In that instance as well, the inventor has dictated the correct claim scope, and the inventor's intention, as expressed in the specification, is regarded as dispositive.").

Precedent forbids, however, a construction of claim terms that imposes limitations not found in the claims or supported by an unambiguous restriction in the specification or prosecution history. *Laitram Corp. v. NEC Corp.*, 163 F.3d 1342, 1347 (Fed. Cir. 1998) ("[A] court may not import limitations from the written description into the claims."); *Comark Commc'ns., Inc. v. Harris Corp.*, 156 F.3d 1182, 1186 (Fed. Cir. 1998) ("[W]hile claims are to be interpreted in light of the specification, it does not follow that limitations from the specification may be read into the claims." (internal quotation marks and alterations omitted)); *SRI Int'l v. Matsushita Elec. Corp. of*

*Am.*, 775 F.2d 1107, 1121 (Fed. Cir. 1985) (en banc) ("It is the *claims* that measure the invention.") (emphasis in original). A final source of intrinsic evidence is the prosecution record and any statements made by the patentee to the United States Patent and Trademark Office ("PTO") regarding the scope of the invention. *See Markman*, 52 F.3d at 980.

Courts may also consider extrinsic evidence, such as expert testimony, dictionaries, or technical treatises, especially if such sources are "helpful in determining 'the true meaning of language used in the patent claims.'" *Phillips*, 415 F.3d at 1318 (quoting *Markman*, 52 F.3d at 980). Ultimately, while extrinsic evidence may aid the claim construction analysis, it cannot be used to contradict the plain and ordinary meaning of a claim term as defined within the intrinsic record. *See Phillips*, 415 F.3d at 1322–23.

## IV. DISCUSSION

1. "*spool*" and "*pulley*"

Hunter Douglas proposes that both "spool" and "pulley" be construed as a "rotating element which a cord or spring at least partially passes around." Ching Feng contends that such a construction is unacceptable in light of the principle that different words in the same or separate claims are presumed to have different meanings. It would define "spool" as a "rotating element on which a cord or spring winds around and at least one end of the cord or spring terminates against the surface of the rotating element," and "pulley" as "a wheel with a grooved rim along which a cord passes and which acts to change the cord's direction."

Hunter Douglas argues that it can overcome the presumption that "spool" and "pulley" have distinct meanings by demonstrating the interchangeable use of the terms throughout the specification. For example, it describes (with reference to an embodiment in FIG. 51) a "pulley system 175, comprising a pair of pulleys or spools 176 and 178 . . . the pulleys 176 and 178 are reverse oriented, conical pulleys or spools 176 and 178" ('814 patent at 26:31-34). It also observes that the specification describes "the pulley system 175 operates similarly to the flat band transmission system 21, except that the diameter of each of the spools 176 and 178 can be varied with respect to their longitudinal axes . . . ." ('814 patent at 26:40-43). According to Hunter

Douglas, the specification does not expressly redefine "spool" or "pulley" to overcome the "heavy presumption" that this term's plain meaning governs. *Azure Networks, LLC v. CSR PLC*, 771 F.3d 1336, 1347 (Fed. Cir. 2014). In the specification, it points out, spools and pulleys are "not limited to conical shapes. Rather, the shape is that which provides the desired diameter ratios axially along the spools. The force requirements for a given system may best be accommodated by decidedly non-conical configurations." ('814 patent at 26:49-54). Hunter Douglas further notes that the prosecution history similarly includes no clear and unmistakable disavowal of claim scope. The terms are used interchangeably by the patent inventors, without redefining the well-understood meaning of the terms.

Hunter Douglas opposes Ching Feng's proposed constructions as impermissibly narrowing the scope of the claims with respect to "spool" by requiring "at least one end of the cord or spring terminates against the surface of the rotating element." Ching Feng, it contends, provides neither intrinsic nor extrinsic evidence supporting this requirement, or the requirement that a "spool" be cylindrical in shape. Similarly, Hunter Douglas objects to Ching Feng's proposed requirement that a "pulley" include "a wheel with a grooved rim" as relying on some embodiments in the patent while ignoring others, thereby importing selective limitations from the specification into the claim, contrary to Federal Circuit law. *Hill-Rom Servs. v. Stryker Corp.*, 755 F.3d 1367, 1371 (Fed. Cir. 2014); *Epos Techs. Ltd. v. Pegasus Techs. Ltd.*, 766 F.3d 138, 1343 (Fed. Cir. 2014) (vacating a district court construction that improperly imported a term from a preferred embodiment into its construction). Hunter Douglas observes pulleys as described in the specification, *see* FIG. 51, are not depicted as "wheels" and do not include a "grooved rim." Because Ching Feng's proposed construction of "pulley" is incompatible with a disclosed embodiment, Hunter Douglas urges the rejection of that construction.

Ching Feng argues that as a matter of plain meaning, a "spool" is not a "pulley." The dictionary defines a "spool" as "[a] cylinder on which wire, thread, or string is wound." *Webster's II New Riverside College Dictionary* (1995). A dictionary definition of "pulley" is "[a] simple device for changing the direction and point of application of a pulling force, esp. for lifting weight,

ORDER CONSTRUING CLAIMS
CASE NO. 17-cv-01069-RS

consisting of a wheel with a grooved rim in which a pulled rope or chain is run." *Webster's II New Riverside College Dictionary* (1995). Ching Feng notes that in contrast to a spool, a pulley does not collect a length of cord wound around it, but rather rotates as the cord passes by it. With respect to the construction of "spool," Ching Feng does not oppose striking the requirement that one end of the cord terminate in a spool, although it expresses doubt that a spool would lack such a termination. As to Hunter Douglas's objection to the inclusion of a grooved rim in the construction of "pulley," Ching Feng responds that this is contrary to the dictionary definition of a pulley and that the grooved rim performs a function, which is to keep the cord from slipping off. With or without modification to its proposed construction for "spool," Ching Feng insists that "spool" and "pulley" must carry different meanings in light of the claim language and prosecution history.

According to Ching Feng, claim language associates "winds," "unwinds," and "wraps around" exclusively with claimed "spools." ('814 patent, claims 2, 11, 12, 19, 20, 23; '051 patent, claim 17). In contrast, it argues, "passes" is exclusively associated with the claimed pulleys. ('814 patent, claims 6 and 15, at 34:4-5 ("further comprising at least one lift cord pulley about which the [lift/first] cord passes.")). While Hunter Douglas points to the specification's disclosure that "pulley system 175 compris[es] a pair of *pulleys or spools* 176 and 178 . . ." Opening Br. at 9:7-12, quoting '814 patent at 26:31-32 (Hunter Douglas emphasis), according to Ching Feng, this does not mean that a spool is a pulley; it means that the "pulley system" can be made with either pulleys or spools, which are each a distinct embodiment. Subject matter disclosed but not literally claimed is dedicated to the public, and the doctrine of equivalents cannot be used to recapture the unclaimed subject matter. *Maxwell v. J. Baker, Inc.*, 86 F.3d 1098, 1107 (Fed. Cir. 1996); *Johnson & Johnson Associates, Inc. v. R.E. Serv. Co.*, 285 F.3d 1046, 1054 (Fed. Cir. 2002). Ching Feng argues that because the patents disclose spools and pulleys, and a spool is not a pulley as a matter of plain meaning, where the patentee chose to claim a component as a "spool" the claimed spool cannot be construed as a pulley, and vice versa.

Ching Feng also asserts that a claim amendment in the prosecution history, which changed

the word "pulley" to "wind-up spool," was not a mere formality. It observes that in a summary of an interview with the examiner, the patentee characterized the amendment as distinguishing prior art. Ching Feng takes the position that because Hunter Douglas amended its claims to change "pulley" to "wind-up spool," it narrowed or surrendered the subject matter, and prosecution estoppel prevents Hunter Douglas from now claiming that a spool should be construed as a pulley. *See Festo Corp. v. Shoketsu Kinzoku Kogyo Kabushiki Co.*, 535 U.S. 722, 734-35 (2002). In other words, Hunter Douglas has no basis, Ching Feng insists, to assert that it lacked the words to describe the subject matter in question. Hunter Douglas responds that the above referenced amendment to claim 1 of the '051 patent was only made to correct an antecedent basis issue (changing "wind up spool . . . wherein the lift cord is wrapped around the pulley" to "wind up spool . . . wherein the lift cord is wrapped around the wind-up spool."). Accordingly, it denies that the claim amendment refutes the assertion that spools and pulleys are used interchangeably in the patent.

In the final analysis, although Ching Feng is correct that as a matter of dictionary definition, spools and pulleys are not the same thing, they are equivalent in the specific context of the particular claims and specification. Setting aside Ching Feng's proposed details about end termination or a grooved rim, however, the main difference between spools and pulleys appears to be the extent to which a cord or spring "passes around" a "rotating element." That difference is inconsequential in the context of the Asserted Claims, as there is no evidence of any effort to distinguish spools from pulleys—rather the terms are used interchangeably to describe the same thing. The claims and specification expressly disclose pulleys that are not wheels with a grooved rim or act to change a cord's direction, rendering those embodiments incompatible with Ching Feng's proposed construction. Therefore, because "spool" and "pulley" are used interchangeably in the Asserted Claims, both terms will be construed as a "rotating element which a cord or spring at least partially passes around."

2. "*wind(s)*"

Ching Feng would define "wind(s)" as "a rotational collection of cord, twine, rope, wire,

band, or other similar material around a cylindrical object resulting in a shortening of the material." According to Ching Feng, cords or springs "wind," "unwind" or "wrap around" spools and "pass about" pulleys. Therefore, Ching Feng rejects as overbroad Hunter Douglas's proposed construction, which includes the word "pass(es)."

Hunter Douglas proposes a construction that it views as reflecting the plain and ordinary meaning of the term "wind(s)," as a person of ordinary skill in the art would understand it: "at least partially passing around." It opposes Ching Feng's construction as impermissibly narrowing the claims with no justification from the intrinsic or extrinsic evidence, noting that nothing in the claims, specification, or file history disavows or otherwise defines "wind(s)." Specifically, Hunter Douglas asserts that Ching Feng's limitation of a "cylindrical object" would exclude disclosed embodiments in the specification that comprise "a pair of conical drums or spools 176, 178, about which is wound a cord or band 178." ('814 patent at 11:1-3). A claim construction that excludes a preferred embodiment is "rarely correct without any persuasive evidentiary support." *MobileMedia Ideas LLC v. Apple Inc.*, 780 F.3d 1159, 1181 (Fed. Cir. 2015), *cert. denied*, 136 S. Ct. 270 (2015). Hunter Douglas also contends that Ching Feng's proposed definition would be likely to confuse a jury because as the spring moves from one spool to another, the length of the spring itself does not change.

Ching Feng offers to drop the words "cylindrical object" in favor of "rotating element" if deemed necessary. Ching Feng also argues that "shortening of material" refers to what happens to the length of cord that is not wound onto the spool, which does not impose a limitation on what is done with the length of material not on the spool. That the length of material may be taken up by another spool is immaterial. Ching Feng would agree to change the proposed construction to "shortening of material not wound onto the spool" if deemed necessary.

Although Ching Feng's proposed construction is not unreasonable in light of its explanation, its lengthy definition of a commonly understood term such as "wind(s)" serves to obscure rather than illuminate the plain and ordinary meaning of the word. Therefore, Hunter Douglas's proposed construction shall be adopted.

3. *"unwind(s)"*

Ching Feng proposes that this term be construed as "reverse of winds." Hunter Douglas objects to this proposed construction as unnecessarily confusing. Because it is not sufficiently clear what constitutes the "reverse" of "wind(s)," a word that itself needs construction, Ching Feng's proposal may lead to inconsistent understandings as to the meaning of the term. Accordingly, Hunter Douglas's proposal—"at least partially uncoils"—will be adopted.

4. *"[a cord is] wrapped around"*

Ching Feng proposes that this term be given the same construction as "wind(s)" for the same reasons articulated as to "wind(s)." Hunter Douglas argues persuasively that no construction is required, because the plain and ordinary meaning of this term is well understood to one of ordinary skill in the art. Because the unwieldy nature of Ching Feng's proposed definition potentially suggests that the term is being construed in some fashion other than its plain and ordinary meaning, that construction must be rejected. Therefore, the term "[a cord is] wrapped around" requires no construction.

5. *"spring drive" / "spring drive unit" / "spring drive system"*

Hunter Douglas proposes that each of these terms be construed as "a device that utilizes rotation or winding of a flat spring to generate an output force." According to Hunter Douglas, the context of the claims and specification make clear that the spring drive in the Asserted Claims utilizes a flat spring. Claims 23 and 24 of the '814 patent, claims 1, 4-8, 17-21, and 24 of the '554 patent, and claims 1-3 of the '051 patent explicitly recite that the spring drive system uses flat springs. Although claims 1-2 and 4-20 of the '814 patent do not mention a flat spring, they do refer to a storage spool and an output spool, which from a structural point of view indicates the use of a flat spring. The claims' reference to a storage spool indicates that some portion of the spring is stored, at least temporarily, on the storage spool. A flat spring winds onto and off of a storage spool to store and provide force. Because helical springs do not function in this manner[2], Hunter

---

[2] Hunter Douglas observes that unlike flat springs, helical and coil springs have one end fixed to a housing or other fixed structure such that one end is stationary while the opposite end is rotated to

ORDER CONSTRUING CLAIMS
CASE NO. 17-cv-01069-RS

1    Douglas argues, only a "flat spring" can meet the "storage spool" and "output ends" limitations of
2    claims 1, 11, and 20 of the '814 patent. Moreover, the disclosure within the specification related to
3    other types of springs, such as helical/coil springs, does not refer to storage and output spools. For
4    example, within the description of FIGs. 5C and 10C, the helical/coil spring 40 has only one end
5    anchored to a support 342/42C such that the first end does not rotate. ('814 patent at 14:10-17). As
6    such, Hunter Douglas takes the position that structural differences, as well as differences in
7    terminology within the specification and the claims themselves, indicate that the Asserted Claims
8    are directed only to embodiments that utilize flat springs. According to Hunter Douglas, Ching
9    Feng's proposed construction, which omits the word "flat spring," is misleading because it
10   embraces spring types that cannot actually be used in the claimed systems.

11   Ching Feng argues that the inconsistency in the Asserted Claims' use of the words "flat
12   spring" weighs in favor of not construing the term.[3] With respect to claims that explicitly recite a
13   flat spring, Ching Feng asserts that adding the words "flat spring" to the construction introduces
14   unnecessary redundancy. *See Mangosoft, Inc. v. Oracle Corp.*, 525 F.3d 1327,1330-31 (Fed. Cir.
15   2008). On the other hand, where claims do not mention a flat spring, it is axiomatic that courts
16   should not import limitations of the embodiments into the claims. *See Markem-Imaje Corp. v.
17   Zipher Ltd.*, 657 F.3d 1293, 1300-01 (Fed. Cir. 2011) (citing *Rambus Inc. v. Infineon Tech. AG*,
18   315 F.3d 1081, 1093 (Fed. Cir. 2003). That a device will not operate without a given element is
19   not reason to incorporate the element in the construction of the claims. *Id.* at 1301. Because there
20   is no evidence that the patents disclose all possible spring drives using spools, the claims that do
21   not recite a "flat spring" may be broader than the "flat spring" embodiments.

22   On balance, Hunter Douglas's choice to include the recital of "flat spring" in some claims

---

store force.

[3] Ching Feng also asserts that its proposed construction is consistent with that offered by Hunter Douglas in a separate case covering the same patent. Hunter Douglas, responds that Ching Feng incorrectly refers to a claims chart that was later amended in the other litigation. Along with its reply, Hunter Douglas attaches the amended version, which is consistent with the construction Hunter Douglas proposes here.

ORDER CONSTRUING CLAIMS
CASE NO. 17-cv-01069-RS

10

and not others within the same patent defeats its present effort to have the term "flat spring" included in claim construction. Hunter Douglas fails to offer a persuasive justification for failing to recite a "flat spring" in connection with claims 1-2 and 4-20 of the '814 patent, when it could have done so, as evidenced by the presence of "flat spring" in claims 23 and 24. Therefore, the term will be construed as "a device that utilizes rotation or winding of a spring to generate an output force." This construction properly reflects the scope of the claims, while omitting Ching Feng's proposed inclusion of the word "torque" as potentially confusing to a jury, *see infra* Part IV.6.

6. *"transmission"*

Hunter Douglas proposes that no construction is necessary for this term, or in the alternative, that it be construed as "a device or devices working in conjunction that operate to either offset or supplement the operating characteristics of another device." According to Hunter Douglas, because nothing in the claims, specification, or file history disavows or otherwise defines "transmission," the term's construction should reflect its plain and ordinary meaning to one of skill in the art. Further, the specification of the '814 patent expressly states that the "transmission" is "designed to offset the normal operating characteristics of the coil spring 40." ('814 patent at 14:2-23). It does not state that the claimed "transmission" must result in "an output of an increase or decrease in torque or force" as required by Ching Feng's proposed construction. Those requirements are only recited in some embodiments. ('814 patent at 11:15-18 ("[t]he cord or band shift transmission . . . provides a *preferably* varying drive ratio which is used to increase or diminish the torque or force of the spring drive unit.") (emphasis added)). Finally, Hunter Douglas criticizes Ching Feng's characterization of the "transmission" as a single device rather than multiple devices working in concert.

Ching Feng argues that the principal reason for construing terms is to make claim terms understandable to a jury of laypersons. In Ching Feng's view, construction is necessary because few people are familiar with the idea of having a "transmission" in their window blinds. Ching Feng proposes that "transmission" be defined as "a device that converts torque or force from an

energy source resulting in an output of an increase or decrease in torque or force and applies that converted torque or force to another device." According to Ching Feng, this construction is consistent with the dictionary definition of the term: "transference of force between machines or mechanisms, often with changes of torque and speed." *Random House Webster's Unabridged Dictionary: Indexed*, 2d Ed. (1997). As that definition suggests, the characteristic that distinguishes a transmission from other mechanical connections is the alteration to the original force applied. Ching Feng also contends that its proposed construction is both consistent with the claims language and the specification. Claim 1 of the '814 patent recites "a transmission for *tailoring the spring force to a varying weight* of the window cover is moved between the extended position and the retracted position." ('814 patent, claim 1, at 33:58-61 (emphasis added)). The purpose of the transmission is to address a shortcoming of prior art spring-driven blinds: without a transmission an inappropriate force is applied to a weight that changes as the blind is retracted or extended. ('814 patent at 11:15-20 (the transmission "provides a preferably varying drive ratio which is used to *increase or diminish the torque or force* of the spring drive unit") (emphasis added)). The transmission operates to ensure that the converted force is tailored to the specific weight of the window cover given its position.

Ching Feng asserts that the file history further supports its proposed construction. On August 27, 2015, '814 patent applicant Andrew J. Toti represented to Blair M. Johnson, the primary examiner, that he "intended to add [a] limitation that the transmission varies forces between the spring drive and the cord spools, which would appear to read over the prior art of record." Applicant-Initiated Interview Summary Application No. 14/727,122, dated August 27, 2015, at p. 2, attached to the Declaration of Peter E. Soskin as Exhibit 2. Thus, the prosecution history is logically consistent with Ching Feng's construction and the claim language: the amended claim language provides that the transmission is for "tailoring the spring force to a varying weight of the window cover." ('814 patent, claim 1, at 33:58-61). Finally, in response to Hunter Douglas's argument about "single" versus "multiple devices," Ching Feng stands by its position that from a functionality perspective, a transmission is a single device even if it is

comprised of multiple components.

Although use of the term "transmission" warrants construction for the benefit of jurors unfamiliar with the term in the context of window blinds, the parties' lengthy proposed constructions threaten to confuse rather than clarify the terms' definition. Ching Feng's proposed construction includes the word "torque," which may introduce an unfamiliar concept to a jury of laypersons. Hunter Douglas's proposed construction on the other hand, is wordy and includes the words "or devices working in conjunction" in order to convey the mundane assumption that a "device" might be composed of numerous component parts, that may themselves be called "devices." Each party's proposed construction attempts to explain the transmission's role in adjusting the spring force as the blind moves up and down, resulting in definitions that are too meandering to be helpful to a jury. Therefore, both parties' proposed constructions are adopted in part and rejected in part, and the term will be construed as "a device that converts force from an energy source and applies it to another device."

7. "*housing*"

Hunter Douglas asserts that this term should be given its plain and ordinary meaning and need not be construed. According to Hunter Douglas, the specification does not redefine or disavow the ordinary meaning of "housing" to overcome the "heavy presumption" that the plain and ordinary meaning applies. Furthermore, according to Hunter Douglas, the function of the "housing" is clearly laid out in the specification such that construction is unnecessary. It argues, therefore, that there is no need to replace this term with a complicated definition that would needlessly confuse a jury.

Ching Feng asserts that because it is a component of a utility patent, the "housing" should have a function. In order to serve a function, it must be construed to do something rather than simply be something. Because the role of housing in the claimed invention is unclear from the claim language, Ching Feng proposes a construction that is based on a dictionary definition and consistent with the specification: "a support frame upon or within which mechanical parts are mounted." Because this definition is not unduly complicated and is consistent with the claim

specifications, Ching Feng's proposed construction will be adopted.

## V. CONCLUSION

The disputed claim terms of the patents-in-suit are construed as follows:

|     | Claim Term | Construction |
| --- | --- | --- |
| 1. | "spool" | "rotating element which a cord or spring at least partially passes around" |
| 2. | "pulley" | "rotating element which a cord or spring at least partially passes around" |
| 3. | "wind(s)" | "at least partially passing around" |
| 4. | "unwind(s)" | "at least partially uncoils" |
| 5. | "[a cord is] wrapped around" | No construction necessary. |
| 6. | "spring drive"/ "spring drive unit" / "spring drive system" | "a device that utilizes rotation or winding of a spring to generate an output force" |
| 7. | "transmission" | "a device that converts force from an energy source and applies it to another device" |
| 8. | "housing" | "a support frame upon or within which mechanical parts are mounted" |

**IT IS SO ORDERED**.

Dated: February 7, 2018

_____
RICHARD SEEBORG
United States District Judge